## AIRCRAFT SALE & PURCHASE AGREEMENT

**THIS AIRCRAFT SALE & PURCHASE AGREEMENT** (the "Agreement"), made and dated April 27, 2015 (the "Effective Date") by and between BT Aviation, LLC, a Texas limited liability company whose address is 3712 Euclid Ave., Dallas, Texas 75205 (the "Seller"); Richard Toussaint, a resident of Dallas County, Texas (the "Seller's Principal"); Thorndike Ventures, LLC, a Delaware limited liability company, whose notice address is 10731 South 94th East Court, Tulsa, Oklahoma  74133 (the "Purchaser") and Todd M. Coady, a resident of Tulsa County, Oklahoma (the "Purchaser's Principal").

**WHEREAS**, Seller and Purchaser's Principal entered into an Offer to Purchase (the "Offer") the Aircraft (as defined below) dated April 3, 2015 and, as provided in that agreement, the parties hereby enter into this Agreement which supersedes and replaces the Offer except as set forth herein. Pursuant to Section 10 of the Offer, Purchaser's Principal has assigned the Offer to the Purchaser and Seller hereby consents to such assignment.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein, the parties agree as follows:

## SECTION 1   SALE OF AIRCRAFT

1.1   **Agreement to Sell and Buy**. Subject to the terms and conditions set forth in this Agreement, Seller hereby agrees to sell, transfer, and deliver to Purchaser; and Purchaser agrees to purchase the following aircraft together with a complete and up-to-date set of the Aircraft Documents as defined in Section 1.3(c) below:

| | |
|---|---|
| Make and Model: | 2000 Cessna 560XL (Citation Excel) |
| Airframe Serial No.: | 560-5067 |
| FAA Registration No.: | N309BT |
| Left Engine Model & Serial No. | Pratt & Whitney PW545A, Serial number PCE-DB0195 |
| Right Engine Model & Serial No. | Pratt & Whitney PW545A, Serial number PCE-DB0136 |
| APU | Honeywell RE100XL, Serial number P-745 |

The above aircraft, engines, Aircraft Documents and all other items described in this Section 1.1 and in Exhibits B, will hereinafter be referred to collectively as the "Aircraft" and the above two engines shall be referred to as the "Engines".

1.2   **Purchase Price; Terms of Payment**.  The Purchase Price of the Aircraft shall be Three Million Four Hundred Fifty dollars and no cents ($3,450,000.00), which shall be paid in accordance with the Closing Procedures set forth in Section  1.6 below.

1.3   **Escrow Deposit & Inspections**.

(a)   Pursuant to the Offer, Purchaser has placed a One Hundred Fifty Thousand dollars and no cents ($150,000.00) deposit in escrow (the "Escrow Deposit") with US Aircraft Titles, Inc. located at 3600 South Moulton, Oklahoma City, OK 73179. The Purchaser and Seller have agreed to utilize AIC Title Service LLC, 6350 West Reno, Oklahoma City, OK  73127 which shall hereafter be referred to as the "Escrow Agent". The Purchaser and Seller shall cause the Escrow Deposit to be released from US Aircraft Titles, Inc. and deposited with the Escrow Agent.

12975298v.5

Exhibit A

(b) Purchaser shall, at Purchaser's expense, perform a pre-purchase evaluation at West Star Aviation (the "Inspection Facility") at either the Grand Junction Regional Airport ("KGJT") or the St. Louis Regional Airport ("ALN") as mutually agreed by Seller and Purchaser. Such pre-purchase evaluation shall consist of a review of all Aircraft Documents, verification of Aircraft equipment and the procedures and tasks set forth on Exhibits A and A-1 (the "Inspection").

(c) For the purpose of this Agreement, "Aircraft Documents" means all documents and records in printed and digital form relating or required to be maintained with respect to the Aircraft, including, without limitation, all airframe, engine, and accessory logbooks, flight records, weight and balance manuals, overhaul records, maintenance records, maintenance contracts, computerized maintenance programs, airframe and aircraft component warranties, engines warranties, auxiliary power unit warranties, avionics warranties, wiring diagrams, drawings, data, and all issued Federal Aviation Administration ("FAA") Form 337's and/or all foreign equivalents, and any and all other records related to the Aircraft in Seller's possession including copies of invoices for maintenance and repairs during Seller's ownership of the Aircraft, all of which shall be delivered to the Inspection Facility with the Aircraft; provided, however, that the term Aircraft Document(s) shall not include any of Seller's internal documents that relate to the Aircraft but that are not required by Purchaser to be able to document the on-going maintenance history of the Aircraft and are not required to be kept or maintained by the Federal Aviation Administration.

(d) Purchaser shall pre-pay the expense of the Inspection.  The Seller shall relocate the Aircraft to the Inspection Facility within three (3) Business Days following the execution of this Agreement by the all of the parties, and the Inspection Facility's receipt of Purchaser's payment for the flat rate costs of the Inspection. The Inspection shall commence as soon as possible following the Aircraft's arrival at the Inspection Facility. Upon the commencement of the Inspection, the Escrow Deposit will immediately become nonrefundable, except as provided in this Agreement. Within two (2) Business Days following delivery of the an Inspection report to the Purchaser and Seller by the Inspection Facility, Purchaser shall deliver to Seller notice, in the form of Exhibit C attached hereto, of Purchaser's acceptance or rejection of the Aircraft, subject to the limitations of this Section 1.3.

(e) Upon Purchaser's acceptance, Seller shall cause the Inspection Facility to correct, at Seller's expense, the discrepancies identified during the Inspection (the "Discrepancies") as soon as practicable. For the purpose of this Agreement, the term "Discrepancies" means only those items identified by the Inspection Facility that the Inspection Facility reasonably deems are necessary to be corrected in order to render the Aircraft in an airworthy condition with all airworthiness systems functioning normally and to the applicable manufacturer's specifications together with the "airshow" system in the Aircraft and its component parts.  For the avoidance of doubt, it is expressly agreed that the term "Discrepancies" does not include any merely cosmetic items; further, any maintenance or modification items not expressly identified as Discrepancies by the Inspection Facility will be considered discretionary, the repair or cost of which will be at Purchaser's expense.

(f) Purchaser may only be permitted to reject the Aircraft if, on or before May 22, 2015 (i) the Aircraft cannot be rendered in an airworthy condition suitable for operation under Parts 91 and 135 of the Federal Aviation Regulations; (ii) the Aircraft has corrosion

that cannot be repaired to within the limits described in Section 1.4(g) below; (iii) the Aircraft has material damage history; (iv) if any Aircraft Documents which are required to be kept or maintained by the FAA with respect to the Aircraft are missing, and have not been replaced or substituted at Seller's cost in a commercially reasonable manner permitted under the FARs, if applicable; or (v) the Seller fails to fund the costs of any Other Repairs in excess of the Repair Threshold as set forth in Section 1.3(i). If the Aircraft is rejected, Purchaser shall immediately pay to Seller the Relocation Expenses following which the Escrow Agent will immediately refund the Escrow Deposit to Purchaser, whereupon this Agreement shall terminate, and the parties will have no further obligation to the other.

(g)  Purchaser shall be responsible for the cost to relocate the Aircraft (i) from Dallas Love Field Airport ("KDAL") to the Inspection Facility and either (ii) from the Inspection Facility to Dallas Love Field Airport ("KDAL") if the Buyer rejects the Aircraft or (iii) from the Inspection Facility to Tulsa International Airport ("KTUL")   for Closing. Such costs shall include fuel, engine program reserves, and direct out-of-pocket pilot expenses for each such flight (collectively the "Relocation Expenses"). Purchaser shall reimburse Seller for such costs upon rejection of the Aircraft or at Closing. Purchaser shall be entitled to have up to two (2) representatives onboard the Aircraft during each such flight.

(h)  If the Aircraft is accepted by the Purchaser, and when the Seller is ready to fly the Aircraft to Tulsa International Airport ("KTUL") in Delivery Condition, the balance of the purchase price, three million three hundred thousand U.S. Dollars (U.S. $3,300,000.00), shall be funded by Purchaser to Escrow Agent by wire transfer of immediately available U.S. funds.

(i)  During the Inspection, the Inspection Facility shall further verify that all other installed Aircraft systems and equipment (that are not airworthy in nature) function in accordance with the manufacturers' specifications and/or maintenance manuals (the "Other Systems"). For the sake of clarity and avoidance of doubt, the parties further agree that Other Systems means systems which, even if need of repair, would not constitute Discrepancies. Notwithstanding the foregoing, the parties expressly agree that the term "Other Systems" shall not include items that are merely cosmetic in nature. To the extent any Other Systems require repairs to function in accordance with the manufacturers' specifications and/or maintenance manuals (the "Other Repairs"), the Inspection Facility shall provide Seller and Purchaser a cost estimate to complete the Other Repairs. In the event the cost to rectify the Other Repairs exceeds the amount of $50,000.00 (the "Repair Threshold"), then the Seller may, at its election, either credit Purchaser at the Closing the amount of the cost to rectify the Other Repairs in excess of the Repair Threshold, or Seller may decline to provide such a credit to Purchaser. In the event Seller declines to provide such a credit to Purchaser, the Purchaser may, at its option, elect to reject the Aircraft, in which case the termination provisions of Section 1.3(f) above shall apply.

1.4  **Delivery of Aircraft**. Seller shall deliver and Purchaser shall accept the Aircraft at the Tulsa International Airport ("KTUL") upon return to service as set forth in Section 1.5 Purchaser.  Solely as a condition precedent to Purchaser's obligation to complete the Closing and not as a representation or warranty of Seller that survives Closing in any way, on the Closing Date, the Aircraft shall be tendered to Purchaser in the following condition ("Delivery Condition"):

12975298v.5

Exhibit A

(a) in an airworthy condition, and suitable for operation under Part 91 of the Federal Aviation Regulations; with a valid FAA Standard Airworthiness Certificate (FAA Form 8100-2);

(b) with all Discrepancies (i.e., airworthiness and "return to service" discrepancies) of the Aircraft identified by the Inspection Facility repaired and functioning in accordance with manufacturer's specifications at Seller's sole cost;

(c) with each of the Engines able to produce its rated takeoff power in a ground power run;

(d) current on all manufacturers' recommended maintenance and inspection schedules (including all calendar and hourly inspections) with no extensions or deferrals, and in compliance with all applicable FAA airworthiness directives and manufacturers' mandatory service bulletins (or equivalents) with effective dates on or before Return to Service;

(e) with all applicable Airframe, Engines, and avionics maintenance programs and contracts (the "Maintenance Programs"), if any, paid through the date and time of the Closing except to the extent any such Maintenance Program or similar warranty is not transferrable by its own terms (Purchaser shall fund the application and transfer fees for same, if any);

(f) with no known corrosion or history of corrosion beyond manufacturer's limits in accordance with the manufacturer's maintenance manual, and without known material damage history of any kind;

(g) with no parts, systems or components installed in the Aircraft on a temporary loan or exchange basis, unless supplied pursuant to one or more of the Maintenance Programs (if applicable);

(h) with all Aircraft Documents;

(i) with all equipment, accessories and loose equipment as listed on Exhibit B.

(j) with airframe and engine hours as set forth on Exhibit B plus ten (ten) hours and all time for delivery to the Inspection Facility and the delivery location;

(k) with both engines eligible for enrollment by Purchaser in the Power Advantage Plus Program at no cost to Purchaser;

(l) with the Aircraft eligible for enrollment by Purchaser in the Pro Parts Airframe Systems & Avionics Parts Program & Aux Advantage APU program at a cost to the Purchaser within 10% of $190,000.00; and

(m) with commercially reasonable assurance that the representations and warranties in Section 2.4 are true and correct.


1.5 **Closing Date**. Closing shall occur within three (3) Business Days (the "Closing Deadline") following correction of the Discrepancies, which shall be evidenced by the Aircraft's return to service through appropriate logbook entries by the Inspection Facility ("Return to Service") and delivery of the Aircraft to KTUL. The date upon which Closing occurs shall be referred to as the "Closing Date". In any event, the parties shall endeavor to ensure the Closing Date shall occur on or before May 29, 2015.

12975298v.5

Exhibit A

1.6   **Closing and Closing Procedure**.

(a)  Prior to the Closing Date, Seller shall have:

    i.    delivered, to the Escrow Agent, an undated, but otherwise fully executed, FAA AC Form 8050-2 Aircraft Bill of Sale (the "FAA Bill of Sale" and an undated, but otherwise fully executed, Warranty Bill of Sale in the same form as that attached to this Agreement as Exhibit E;

    ii.    caused to be delivered, to the Escrow Agent, undated, but otherwise fully executed releases of all Liens (the "Releases");

    iii.    have authorized Escrow Agent to act as Seller's Professional User Entity; and

    iv.    caused each lienholder to authorize the Escrow Agent to act as its Professional User Entity.

(b)  Prior to the Closing Deadline, Purchaser shall have delivered, to the Escrow Agent, the Purchase Price, Purchaser's share of the Escrow Agent's fees, and any other unpaid sums payable to Seller (e.g., any unreimbursed Relocation Expenses)(the "Balance of the Purchase Price").

(c)  Upon fulfillment of all obligations in subparagraph (a) and (b) above, and provided that the Aircraft is in Delivery Condition, Seller and Purchaser shall instruct the Escrow Agent to contemporaneously:

    i.    check the FAA Aircraft Registry and International Registry records and databases to ensure that, upon filing the Releases and FAA Bill of Sale (and discharging such International Interests as the Escrow Agent has been authorized to do so by the respective lienholders, if any), Purchaser will receive good and marketable Aircraft title, free and clear of all notations, clouds, claims, liens, mortgages, encumbrances, or rights of others ("Liens");

    ii.    release the Purchase Price, less (A) Seller's share of the Escrow Agent's fees, (B) to discharge any liens on the Aircraft, (C) to the Inspection Facility for any unpaid costs owed by the Seller and (D) Seller;

    iii.    date and file the FAA Bill of Sale (which shall constitute the "Closing") and all applicable Releases at the FAA Aircraft Registry and

    iv.    release the Warranty Bill of Sale to Purchaser.

(d)  As soon as practicable after Closing, the Escrow Agent shall register Purchaser's Contract of Sale interests in the Airframe and Engines;

(e)  Risk of loss, casualty, liability or damage with respect to the Aircraft shall pass to Purchaser upon Closing.

(f)  At the time of Closing, Purchaser shall execute and deliver to Seller an Aircraft Delivery Receipt in the same form as that which is attached to this Agreement as Exhibit D, in exchange for which Seller will deliver the Aircraft and Aircraft Documents to Purchaser.

12975298v.5

Exhibit A

**SECTION 2     DEFAULT, DISCLAIMERS, WARRANTIES AND CAPE TOWN TREATY**

2.1     **Default and Termination**.

    (a) **Seller's Default**.  This Agreement may be terminated by Purchaser, and Purchaser's Deposit shall be promptly refunded to Purchaser,:

        i.  if the Seller is unable for any reason to deliver the Aircraft in Delivery Condition to KTUL within the earlier of May 29, 2015 or ten (10) days of Purchaser's acceptance of the Aircraft; or

        ii.  in the event of a breach by Seller of any provision of this Agreement (provided that Purchaser is in compliance with its material obligations under this Agreement) which breach is not cured within s five (5) Business Days following the delivery to Seller of written notice thereof from Purchaser or which breach by its nature cannot be cured prior to Closing.  If Purchaser elects to terminate this Agreement under this Section, (i) Purchaser shall be entitled to refund of the Escrow Deposit and the Escrow Agent shall immediately refund the Escrow Deposit to Purchaser within two (2) Business Days of written demand by Purchaser therefor, and (ii) Seller shall, within two (2) Business Days of written demand by Purchaser therefor, reimburse all sums paid by Purchaser to the Inspection Facility relating to the Inspection and the Relocation Expenses paid to Seller by Purchaser, and this Agreement shall be of no further force or effect.  Purchaser acknowledges and represents that the liquidated damages amount provided for in this Section is a reasonable estimate of the damages that would be incurred by Purchaser in the event Seller defaults on Seller's obligations under this Agreement.  Purchaser's rights to receive the amounts expressly set forth in this Section as liquidated damages shall be the sole remedy available to Purchaser for breach of contract in the event Seller defaults on Seller's obligations under this Agreement, and Purchaser waives any other remedies that may be available to Purchaser at law or in equity for breach of contract.  Notwithstanding the foregoing, this Section shall not apply to limit Purchaser's remedies in the event of a breach of Seller' representations or warranties set forth in the Warranty Bill of Sale.

    (b) **Purchaser's Default**.  This Agreement may be terminated by Seller in the event of a breach by Purchaser of any material provision of this Agreement (provided that Purchaser has accepted the Aircraft and Seller is in compliance with its material obligations under this Agreement) which breach is not cured within five (5) Business Days of the delivery to Purchaser of written notice thereof from Seller or which breach by its nature cannot be cured prior to Closing, or upon Purchaser's failure to deliver to the Balance of the Purchase Price before the Closing Deadline.  If Seller elects to terminate this Agreement under this Section, Seller shall be entitled to be paid the Escrow Deposit, and the Escrow Agent shall pay the Escrow Deposit to Seller within two (2) Business Days of written demand by Seller, as liquidated damages, and this Agreement shall be of no further force or effect.  Seller acknowledges and represents that the liquidated damages amount provided for in this Section is a reasonable estimate of the damages that would be incurred by Seller in the event Purchaser defaults on Purchaser's obligations under this Agreement.  Seller's rights to receive the amounts expressly set forth in this Section as liquidated damages shall be the sole remedy available to Seller for breach of contract in the event Purchaser defaults on Purchaser's

Exhibit A

obligations under this Agreement, and Seller waives any other remedies that may be available to Seller at law or in equity for breach of contract.

(c) **Bankruptcy Filing**.   Upon Purchaser's written request, the Escrow Agent shall immediately return the Escrow Deposit to Purchaser if there is any bankruptcy filing made by or on behalf of Seller or Seller's Principal.

2.2   **Warranty Disclaimer**.      The Aircraft is being sold on an "as is" basis, and there are no warranties which extended beyond the description of the Aircraft.  With the exception of the warranty of title set forth in <u>Sections 2.4</u> of this Agreement and the Warranty Bill of Sale, SELLER DISCLAIMS ALL EXPRESS OR IMPLIED WARRANTIES OR REPRESENTATIONS OF ANY KIND OR NATURE WHATSOEVER INCLUDING (i) THE AIRWORTHINESS, VALUE, CONDITION, DESIGN, OPERATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR USE OR FOR ANY PARTICULAR PURPOSE OF THE AIRCRAFT OR ANY PART THEREOF;  (ii) THE QUALITY OF THE MATERIAL OR WORKMANSHIP WITH RESPECT TO THE AIRCRAFT OR ANY PART THEREOF; (iii) THE ABSENCE OF LATENT OR ANY OTHER UNKNOWN DEFECT IN THE AIRCRAFT OR ANY PART THEREOF, WHETHER OR NOT DISCOVERABLE;  OR (iv) THE ABSENCE OF OBLIGATIONS BASED ON STRICT LIABILITY IN TORT WITH RESPECT TO THE AIRCRAFT OR ANY PART THEREOF.  UNDER NO CIRCUMSTANCES SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR LOST PROFITS, LOSS OF BUSINESS, LOSS OF USE OR ANY OTHER INCIDENTAL, INDIRECT, CONSEQUENTIAL OR SPECIAL DAMAGES ARISING OUT OF OR RELATED TO THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DELAY IN CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY, AND EACH PARTY HEREBY WAIVES ANY RIGHT IT MAY HAVE TO SUCH DAMAGES.

2.3   **Cape Town Treaty**.

(a) The transaction contemplated by this Agreement is subject to the Convention on International Interest in Mobile Equipment, the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment, both signed in Cape Town, South Africa on November 16th, 2001, together with the Regulations for the International Registry and the International Registry Procedures, and all other rules, modifications, amendments, supplements, and revisions thereto (collectively the "Convention").

(b) Seller will co-operate with Purchaser in order to register Purchaser's Contract of Sale interests in the Airframe and Engines with the International Registry contemporaneously with the filing of the FAA Bill of Sale with the FAA Aircraft Registry. Seller shall take any and all actions necessary to accomplish such registration, including establishing an active and valid Transacting User Entity certificate with International Registry and appointing the Escrow Agent as Seller's Professional User Entity.

(c) The terms "Contract of Sale", "International Registry", "Professional User Entity", and "Transaction User Entity" shall have the meanings given them in the Convention.

2.4   **Representations of Seller and Seller's Principal**. Seller and Seller's Principal hereby represents and warrants as a condition precedent to Purchaser's obligation to consummate the Closing, which warranties survive the Closing, effective as of the Closing, that:

7

(a) Seller is a limited liability company organized in Texas, with all powers adequate for the making and performing of this Agreement (which representation shall also be true as of the execution of this Agreement), the FAA Bill of Sale, the Warranty Bill of Sale and any other documents required in connection herewith.  This Agreement constitutes (and when executed and delivered hereunder by Seller, the FAA Bill of Sale, the Warranty Bill of Sale and such other documents will constitute) the valid, binding and enforceable obligations of Seller.  Neither the execution and delivery of this Agreement, the FAA Bill of Sale, the Warranty Bill of Sale or any other document delivered in connection herewith nor the consummation of any transaction herein or therein referred to or contemplated hereby or thereby or the fulfillment of the terms hereof or thereof has constituted or resulted in or will constitute or result in a breach of the provisions of any contract to which Seller is a party or by which its property is bound.

(b) Seller will have good and marketable title to the Aircraft and the Aircraft Documents and will have full right, title and authority to sell, transfer and deliver all right, title and interest in and to the Aircraft and the Aircraft Documents to the Purchaser.

(c) The Aircraft and the Aircraft Documents will be free and clear of all security interests, liens, claims, encumbrances whatsoever, including, without limitation, any liens for repairs to the Aircraft or for personal property or other taxes (including all sales, use or transfer taxes imposed by any state or local jurisdiction except transfer taxes arising from Purchaser's acquisition) , and there will be no Uniform Commercial Code financing statements on file with respect to the Aircraft, the Aircraft Documents or any component thereof.

(d) There are no actions, suits, claims, investigations or legal, administrative or arbitration proceedings pending or threatened against the Seller which relate to or in any manner affect the Aircraft or the Aircraft Documents.  There are no judgments, decrees, injunctions or orders of any court, governmental department, commission, agency, instrumentality or arbitrator against the Seller relating to or in any manner affecting the Aircraft or the Aircraft Documents.

(e) Seller has not dealt with any broker or person for services rendered in connection with the transaction which is the subject of this Agreement, except for ExpressJets Private Aircraft Solutions.  Seller hereby agrees to indemnify and hold harmless Purchaser from and against all liabilities, costs and expenses (including reasonable attorneys' fees) of every kind arising out of or attributable to any claim made or asserted against Purchaser for brokerage commissions, fees or expenses by ExpressJets Private Aircraft Solutions, or any other broker or person for services rendered or allegedly rendered to Seller, except as expressly set forth herein.

2.5   **Representations of Purchaser**. Purchaser and Purchaser's Principal hereby represents and warrants as a condition precedent to Seller's obligation to consummate the Closing, which warranties survive the Closing, effective as of the Closing, that

(a) Purchaser now has and will, at the time of Closing, have full corporate power and lawful authority to execute, deliver and perform its obligations under this Agreement.

(b) Purchaser has not dealt with any broker or person for services rendered in connection with the transaction which is the subject of this Agreement except for JBA Aviation, Inc.  Purchaser hereby agrees to indemnify and hold harmless Seller from and against

12975298v.5

Exhibit A

all liabilities, costs and expenses (including reasonable attorneys' fees) of every kind arising out of or attributable to any claim made or asserted against Seller for brokerage commissions, fees or expenses by JBA Aviation, Inc. or any other broker or person for services rendered or allegedly rendered to Purchaser, except as expressly set forth herein.

(c)     The Purchaser acknowledges and understands that the delivery of the Aircraft to the Purchaser may be subject to regulation by governmental agencies, including the US Department of State and Department of Commerce, and/or any foreign government or regulatory body, which prohibit export or diversion of certain technical products, data or services ("**controlled technologies**") to certain individuals or countries.   This prohibition includes providing or giving access to such controlled technologies (including without limitation such items that have been identified by the US Export Administration Regulations ("**EAR**") and the International Traffic in Arms Regulations ("**ITAR**")).     The parties acknowledge that providing controlled technologies to certain foreign nationals located in the United States may be deemed by the US Government as equivalent to exporting that controlled technology to a foreign country, including embargoed or restricted countries ("**Prohibited Foreign Nationals**").  The Purchaser represents and warrants that it is not listed as a Prohibited Foreign National, and shall comply in all respects with all export restrictions applicable to this Agreement.

## SECTION 3   MISCELLANEOUS

**3.1**     **1031 Exchange**.          Seller or Purchaser may desire to exchange other aircraft of like kind and qualifying use within the meaning of Section 1031 of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder, for the Aircraft. Such party expressly reserves the right to assign its rights and interests, but not its obligations, hereunder to a qualified intermediary as provided in Reg. 1.1031 (k)-1(g)(4) or qualified exchange accommodation titleholder on or before the Closing Date upon prior written notice to the other party and the other party hereby assents to any such assignment. The parties agree to cooperate with each other or its assignee in order to complete a qualifying like kind exchange for the benefit of such party, provided that the other party shall incur no liability, cost or expense in connection therewith.

3.2     **Assignment**.   This Agreement may not be assigned by any party without the prior written consent of the other party except that either party shall have the right to assign this Agreement to a qualified intermediary or other accommodation title holder as set forth in Section 3.1 in connection with the consummation of a 1031 tax deferred exchange upon written notice to the other party.

3.3     **Assignment of Warranties**.  To the extent that any manufacturer's warranties (express or implied) are still in effect with respect to the Aircraft (other than warranties, which by their terms are unassignable or which would be extinguished by their assignment), Seller hereby assigns such warranties to Purchaser at the time of delivery and agrees to take such reasonable steps as required to enable Purchaser to process warranty claims with the manufacturers.

3.4     **Attorney Fees**.  In the event it becomes necessary to enforce the terms of this Agreement by litigation or otherwise, the prevailing party shall be entitled to recover its reasonable

Exhibit A

attorney fees and court costs, including any such fees or costs arising from subsequent appeals and efforts to execute on any judgment.

3.5 **Benefit, Binding Effect, Governing Law, and Venue**.   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. This Agreement shall in all respects be governed by, and construed in accordance with, the laws of the State of Texas, without giving effect to principals which may govern any conflicts of laws, including all matters of construction, validity and performance, without giving effect to its conflict of laws provisions. Each of the parties irrevocably and unconditionally: (a) agrees that any suit, action or legal proceeding arising out of or relating to this Agreement shall be brought in the District Court of the United States having jurisdiction over Dallas County, Texas; (b) consents to the jurisdiction and court rules in the Venue; and (c) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in any of such courts; and (d) agrees that service of any court paper may be effected on such party by mail (with a copy also sent to counsel for the opposing party), or in such other manner as may be provided under applicable laws or court rules in the Venue.

3.6 **Confidentiality**.   The terms and conditions of this Agreement, and all writings, discussions, and negotiations in connection with the transaction contemplated by this Agreement (including, without limitation, the fact that discussions and negotiations have been conducted by the parties), shall remain strictly confidential and shall not be disclosed by either party, without the prior written consent of the other party, except that each party shall be entitled to disclose the terms and conditions of this Agreement (i) as may be required by law or legal process; (ii) to such party's attorneys, accountants, consultants, and other advisors performing services for such party with respect to or affected by the transaction contemplated by this Agreement including Escrow Agent and Inspection Facility and their personnel; (iii) to each party's employees with a need to know; (iv) as may be required to permit such party to pursue all available remedies for breach of this Agreement by the other party; and (v) to any entity that may provide financing to Purchaser in connection with the acquisition of the Aircraft.

3.7 **Damage or Destruction of Aircraft**.   Notwithstanding any contrary provision of this Agreement, if at any time prior to the delivery of the Delivery Receipt the Aircraft is destroyed, (i) the Escrow Agent shall refund the Escrow Deposit immediately to Purchaser, and (ii) this Agreement shall terminate and be of no further force or effect. In the event of any material and substantial damage to the Aircraft following the Effective Date (other than destruction occurring prior to Closing), Seller shall promptly notify Purchaser in writing of such damage and Purchaser shall, within five (5) Business Days, notify Seller in writing whether it desires (i) that the Aircraft be repaired by Seller in anticipation of the Closing or (ii) to terminate this Agreement. In the event that Purchaser elects to terminate this Agreement as a result of damage in accordance with this Section, (i) the Escrow Agent shall refund the Escrow Deposit immediately to Purchaser, and (ii) this Agreement shall terminate and be of no further force or effect.

3.8 **Taxes**.

(a) Seller has paid and/or shall bear, and shall defend, indemnify and hold Purchaser harmless from and against, any and all sales, use, property, excise and other similar taxes, and any and all taxes, fees, duties, interest, penalties, charges, invoices, claims, assessments and statements imposed or imposable by any federal, state, county, local,

12975298v.5

Exhibit A

foreign or other governmental authority, entity or party arising from any purchase, sale, lease, delivery, transfer, ownership, possession, use, storage, operation, maintenance, consumption, or registration of the Aircraft prior to the Closing except to the extent resulting from any action or omission of Purchaser.  In the event Purchaser receives written notice of any audit, claim, assessment or proposed assessment of any tax for which Seller may be responsible under this Section,  Purchaser shall notify Seller within ten (10) Business Days thereof, and Seller and Purchaser shall reasonably cooperate to manage and/or defend any such audit, claim, assessment or proposed assessment.  Purchaser's failure to notify Seller shall not relieve Seller of its responsibilities under this Section. Seller's Principal shall cause the 2015 Dallas County personal property taxes on the Aircraft to be timely paid in full.

(b) Purchaser shall bear, and shall defend, indemnify and hold Seller harmless from and against any and all sales, use, property, excise and other similar taxes, and any taxes, fees, duties, interest, penalties, charges, invoices, claims and statements relating thereto, which may be imposed by any federal, state, county, local or other governmental authority as a result of the sale, delivery or transfer of the Aircraft to Purchaser, or the ownership, possession, use or storage of the Aircraft on or after Closing, except to the extent (i) imposed on or measured by Seller's income or (ii) related to a period (or portion thereof) ending on or prior to the Closing which are not a result of any action or omission of Purchaser.  In the event Seller receives written notice of any audit, claim, assessment or proposed assessment of any tax for which Purchaser may be responsible under this Section, Seller shall notify Purchaser within ten (10) Business Days thereof, and Seller and Purchaser shall reasonably cooperate to manage and/or defend any such audit, claim, assessment or proposed assessment. Seller's failure to notify Purchaser shall not relieve Purchaser of its responsibilities under this Section.

(c) Notwithstanding any provision to the contrary herein contained, at the Closing, Purchaser shall (i) pay to Seller (in addition to the Purchase Price) the applicable sales or transfer tax due on the sale of the Aircraft hereunder, or (ii) deliver to Seller an exemption certificate, affidavit or other document, satisfactory to Seller, to evidence an exemption or exception from the requirement of having to pay such sales or other transfer tax on the sale of the Aircraft hereunder.

3.9   **Purchaser's Lender**. Purchaser may borrow a portion of the Purchaser Price from a third party lender. Any such loan is not a condition to Closing, but the Seller shall cooperate with Purchaser in connection with any such lender's reasonable requests with respect to the Aircraft and this transaction so long as Seller does not incur any unreimbursed additional costs in connection with same.

3.10  **Force Majeure**.       The term **"Force Majeure"** means any cause beyond a party's reasonable control that prevents a party from meeting its obligations under this Agreement, including, but not limited to, acts of God or the public enemy, acts of terrorism, war or other outbreak of hostilities, civil commotion, strikes, lockouts, and labor disputes (but excludes events described in Section, the remedies for which are described therein).  A party shall promptly notify the other party that it will be unable to perform its obligations hereunder due to a Force Majeure.  In such event, the time for such party's performance shall be extended for the pendency of such event, provided, however, that should such non-performance extend beyond thirty (30) days, the unaffected party may at its option terminate this Agreement upon written notice to the other party.  In such event, the Escrow

12975298v.5

Exhibit A

Agent shall: (i) deduct from the Escrow Deposit and pay to itself one-half of any agreed upon Escrow Fees payable to the Escrow Agent; and (ii) remit the balance of the Escrow Deposit to Purchaser. Thereafter, neither party shall have any obligation or liability to the other with respect to the subject matter of this Agreement, except that Seller shall remain liable to the Escrow Agent for the Escrow Fees. For the avoidance of doubt, Purchaser's failure to make timely payment, for any reason whatsoever, is excluded from Force Majeure.

3.11   **Execution in Counterparts**. This Agreement may be fully executed in two or more counterparts by each of the parties hereto, such counterparts together constituting but one and the same instrument. Such counterparts may be exchanged via facsimile or other electronic transmission.

3.12   **Escrow Fees**. Purchaser and Seller shall equally share (50%/50%) responsibility for payment of any normal escrow fees payable to US Aircraft Titles, Inc and the Escrow Agent in connection with the transaction that is the subject of this Agreement.

3.13   **Entire Agreement**. This Agreement, all exhibits, and all documents and certificates to be delivered by the parties pursuant hereto collectively represent the entire understanding and agreement between Purchaser and Seller with respect to the subject matter of this Agreement. This Agreement supersedes the Offer and all prior negotiations between Purchaser and Seller and all letters of intent and other writings relating to such negotiations and cannot be amended, supplemented or modified except by an agreement in writing which makes specific reference to this Agreement and which is signed by the party against which enforcement of any such amendment, supplement, or modifications is sought.

3.14   **Non-Waiver**. Any failure at any time of either party to enforce any provision of this Agreement shall not constitute a waiver of such provision or prejudice the right of such party to enforce such provision at any subsequent time.

3.15   **Notice**.      All communications, declarations, demands, consents, directions, approvals, instructions, requests and notices required or permitted by this Agreement shall be in writing and shall be deemed to have been duly given or made when delivered personally or transmitted electronically by email, facsimile, receipt acknowledged, or in the case of documented overnight delivery service or registered or certified mail, return receipt requested, delivery charge or postage prepaid, on the date shown on the receipt therefor, in each case at the address set forth in the preamble to this Agreement.

3.16   **Severability**. If any one or more provisions of this Agreement shall be found to be illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

3.17   **Time is of the Essence**.      Time shall be of the essence for all events contemplated hereunder. Further, a "Business Day" means any day of the year in which (i) banks are not authorized or required to close in the State of New York; and (ii) the FAA Aircraft Registry is open for filing title documents.

3.18   **Transaction Costs and Expenses**. Except as otherwise set forth herein, each party to this Agreement shall bear its own transaction costs and expenses, including, without limitation, any brokers' commissions and/or attorneys' fees. Each party hereto agrees to indemnify and hold the other harmless from and against any claims made by any broker, consultant or other party claiming an interest in the Aircraft or the Purchase Price arising from an actual or alleged relationship or agreement with the indemnifying party.

12975298v.5

Exhibit A

IN WITNESS WHEREOF, this Agreement has been executed by Purchaser and Seller as of the date first written above.

SELLER:

BT Aviation, LLC
a Texas limited liability company

By: _____

Richard Toussaint, President

SELLER'S PRINCIPAL:

_____

Richard Toussaint

PURCHASER:

Thorndike Ventures, LLC

By:_____

Todd M. Coady, Manager

PURCHASER'S PRINCIPAL:

_____

Todd M. Coady

12975298v.5

Exhibit A

limitation, any brokers' commissions and/or attorneys' fees.  Each party hereto agrees to indemnify and hold the other harmless from and against any claims made by any broker, consultant or other party claiming an interest in the Aircraft or the Purchase Price arising from an actual or alleged relationship or agreement with the indemnifying party.

IN WITNESS WHEREOF, this Agreement has been executed by Purchaser and Seller as of the date first written above.

SELLER:

BT Aviation, LLC
a Texas limited liability company

By: _____

        Richard Toussaint, President

SELLER'S PRINCIPAL:

_____

Richard Toussaint

PURCHASER:

Thorndike Ventures, LLC

By: _____

        Todd M. Coady, Manager

PURCHASER'S PRINCIPAL:

_____

Todd M. Coady

Exhibit A

### Agreement of Escrow Agent

Purchaser and Seller hereby appoint Escrow Agent as document holder and stakeholder for the sale and purchase of the Aircraft, and Escrow Agent accepts such appointment for and in consideration of its escrow fee. The parties acknowledge that Escrow Agent is acting as a document holder and stakeholder only, its duties being purely ministerial, at their request and for their convenience, that Escrow Agent shall not be deemed to be the agent or trustee for either of the parties, and that Escrow Agent shall not be liable to either of the parties for any act or omission unless it involves willful misconduct or negligence on its part.  Escrow Agent confirms that the Deposit is being held exclusively with respect to the sale of the Aircraft by Seller to Purchaser as contemplated by this Agreement and for no other transaction and no other person.

The undersigned does hereby consent to and join in the foregoing Agreement hereby agreeing to act as Escrow Agent in accordance with the provisions of the Agreement applicable to Escrow Agent. The Escrow fees shall be a total of $      , and Purchaser and Seller shall each be responsible for one-half (1/2) of said total.

**Escrow Agent:**


By:_____

Printed Name:_____

Title:_____

12975298v.5

Exhibit A

**Exhibit A**
**Aircraft Inspections**

- Technical Evaluation at West Star Aviation attached hereto as Exhibit A-1

- 5 Point Engine Runs

- Fuel Leak & Microbial Growth Checks

- Document 5,9,48 & 50 inspections

- Gear Swing

- Other minor checks associated with these inspections to be detailed in a Proposal from West Star Aviation

Exhibit A

**Exhibit A-1**

West Star Aviation - Inspection Proposal No. 1500644GJT, Rev. 2



**West Star Aviation, Inc.**
796 Heritage Way
Grand Junction, CO 81506
800.255.4193 Fax 970.248.5243
www.weststaraviation.com

| | | | |
|---|---|---|---|
| To : | **JBA Aviation, Inc.**<br>**7500 E. Apache Road**<br>**Suite 210**<br>**Tulsa, OK  74115** | Serial #: | **560-5067** |
| | | Registration #: | **N309BT** |
| Email: | **toby.smith@jba.aero** | Date: | **04/06/2015** |
| Attn : | **Toby Smith** | Sales Rep: | **Jerry Sheetz** |
| Tel  : | **918-834-9100** | | |
| | | Proposal #: | **1500644GJT   Rev:2** |

**Airframe Maintenance Inspections**

**1.1     Hold Harmless Agreement**

The aircraft records/logbook review and Technical Evaluation accomplished by West Star Aviation, Inc. are limited in scope.  Discrepant conditions may exist in aircraft that are not discovered or reported.  The Customer and aircraft Owner authorizing this aircraft records/logbook review and Technical Evaluation agree to defend, indemnify and hold West Star Aviation, Inc., its employees and agents harmless from and against all claims, damages, losses and expenses other than those caused by the negligence or willful misconduct of West Star Aviation, Inc. or its employees or agents.

Customer Signature _____     Date _____

Owner Signature _____     Date 4/27/15
        By: Dr. Richard Toussaint
        Title: President, BT Aviation, LLC

Exhibit A



**West Star Aviation, Inc.**
**796 Heritage Way**
**Grand Junction, CO 81506**
**800.255.4193 Fax 970.248.5243**
**www.weststaraviation.com**

| | |
|---|---|
| To : **JBA Aviation, Inc.**<br>**7500 E. Apache Road**<br>**Suite 210**<br>**Tulsa, OK  74115** | Serial #:  **560-5067**<br><br>Registration #:  **N309BT** |
| Email:  **toby.smith@jba.aero**<br>Attn :  **Toby Smith**<br>Tel  :  **918-834-9100** | Date:  **04/07/2015**<br><br>Sales Rep:  **Jerry Sheetz**<br><br>Proposal #:  **1500644GJT   Rev:4** |

**Airframe Maintenance Inspections**

1.1   **Hold Harmless Agreement**
The aircraft records/logbook review and Technical Evaluation accomplished by West Star Aviation, Inc. are limited in scope. Discrepant conditions may exist in aircraft that are not discovered or reported. The Customer and aircraft Owner authorizing this aircraft records/logbook review and Technical Evaluation agree to defend, indemnify and hold West Star Aviation, Inc., its employees and agents harmless from and against all claims, damages, losses and expenses other than those caused by the negligence or willful misconduct of West Star Aviation, Inc. or its employees or agents.


Customer Signature _~~Tld M Caud~~_          Date _4/24/15_

Owner Signature _____          Date _____

Exhibit A

*JBA Aviation, Inc.*
*Proposal 1500644GJT   Rev:4*



**1.2    Comply with Citation 560XL Technical Evaluation**
West Star Aviation, Inc. will accomplish an Evaluation Inspection of the aircraft.

- Loose Equipment Report (Include Pictures).
- Inventory of Log Books, Airframe Flight Manual, Jepps Manuals. Major Alteration documentation (337's, Burn Cert's, S.T.C.'S, Non-Standard Equipment and Installations) etc.
- Technical Evaluation including Log Book Research, Time limited component review, Airworthiness Directive, Service Bulletin/ Letter Research.
- Limited/Component Overhaul 8130-3/Tracability Verification
- Projection Maintenance requirements that are due within 90 Days or 100 Aircraft Flight Hours.
- R.V.S.M. Compliance, Vendor Contact Information.
- Verify contents of the Fly A-Way Kit.
  (T/R Maintenance Lock Out Tool).
- Verification of Required for Dispatch U.S. Interior and Exterior Placards.

FUSELAGE FLIGHT COMPARTMENT ITEMS
- Avionics Check List including requirements for E.L.T. Battery Expiration Date, Cockpit Voice Recorder Operational Check, Compass Swing, Crew Oxygen Mask Microphone Operational check, Inspection of the R.V.S.M Fuselage Structure, Operational check of the Under Water Locator Beacons, Emergency Battery Pack Inspection, Leak Check of Pitot/Static System.
- Two Year requirements for F.A.R. 91-411 and 91.413 Air Data System
- Inspect Pilot and Co-Pilots Seats for condition and operation including Seat height Bungees, Seat attach points, etc.
- Does the Aircraft have a Emergency Vision Assurance System.
- Inspect Flight Compartment Instruments for any Damage including the Magnetic Compass Mounts.

FUSELAGE CABIN INTERIOR ITEMS
- Inspect Cabin / Lav Under Floor Structure, Plumbing, Limited Center Isle only.

- Inspect Cabin Compartment Lighting and operation of Passenger Safety system.
- Verify operation of Externable Service Toilet.

FORWARD FUSELAGE EXTERIOR ITEMS
- Window Evaluation.
- Inspect Flight Compartment windows. Note Cessna Direct Approach News Letter ( Cracking, Crazing Normal in Sensor Element). Visual Only
- Inspect Baggage and Service Compartment Doors for proper operation including Seals and Latches.
- Verify Oxygen Pressure Blow out disc for condition.
- Check condition of the Pitot/Static Ports and A.O.A. Vane.

WING ITEMS
- Inspect Upper and Lower Wing Skins for condition including corrosion, smoking rivets etc.
- Inspect for Dents on L/H and R/H Inboard Wing Heated Leading Edges.
- Static Wick Base Inspect for Gaps and Corrosion.

WHEEL WELLS
- Inspect Nose, L/H and R/H Main Tires for Wear Limits I.A.W. Michelin Service Manual.
- Remove Wheel Assemblies Inspect Wheel Assy, Landing Gear Trailing Link/Axles for Corrosion, Bearings.

FUSELAGE TAIL CONE ITEMS

Exhibit A

*JBA Aviation, Inc.*
*Proposal 1500644GJT   Rev:4*



. Aft Baggage Door Inspect for Seal damage.
. Visually Inspect Air Cycle Machine Turbine Fan Inlet. Reference Cessna Direct Approach News Letter
  (Heat Exchanger Contamination).
. Visually Inspect Air Cycle Machine Oil Sump for signs of oil leakage.
. Visually Inspect Ducts and Plumbing for condition and any Leaks.
. Verify Engine Fire Extinguishers for security and condition.
. Check Hydraulic Fluid Reservoir for General condition including instructional Placard, Leaks etc.

ENGINE ITEMS
. Inspect Oil Filters.
. Inspect L/H and R/H Engine Nacelle and the Pylon Upper and lower Skins and Fire seals for condition.
. Inspect Engine Inlets for General Condition including T1 and P1/T1 Sensors, evidence of F.O.D., damage
  Fan Blades, missing Rivets.
. Ground performance POD runs, check all systems for operation
. Inspect Engines for any visible Leaks ( Fuel, Oil, etc.), Plumbing Damage, Gear Box condition,
  Cowling condition.

APU ITEMS
. Inspect  A.P.U. Inlet and Exhaust for Condition.

ADDITIONAL SERVICES
. Perform aircraft return to Service Pre-Delivery using West Star Aviation Form WSF 301.

**Firm Price Labor:**          $    14,500.00

Accept _T̸h̸C̸_          Decline _____

**1.3    Comply with Inspection Document 50 Inspection of the Cessna Recommended Inspection
Program**
West Star Aviation, Inc. will accomplish Inspection Document 50 per the Citation 560XL Maintenance Manual.

. Landing Gear General Visual Inspection
. Nose Landing Gear Wheel Well General Visual Inspection
. Horizontal Stabilizer Aft Spar Area General Visual Inspection
. Vertical Stabilizer Aft Spar Assembly General Visual Inspection
. Aft Wing Spar Area General Visual Inspection
. Main Landing Gear Wheel Well General Visual Inspection

Note:The flat rate labor will be a no charge when done in conjunction with the Inspection Document 2.

**Firm Price Labor:**          $    1,116.00

Accept _T̸h̸C̸_          Decline _____

Exhibit A

*JBA Aviation, Inc.*
*Proposal 1500644GJT    Rev:4*



**1.4    Comply with Inspection Document 5 of the Cessna Recommended Inspection Program**
West Star Aviation, Inc. will accomplish Inspection Document 5 as described in the Citation 560XL Maintenance Manual

.    Aileron Outboard Wing Control Cable
.    Vertical Spar Pivot Fitting Lower Flange and Clip

                    **Firm Price Labor:**            $      2,744.00

                    Accept _TMC_                     Decline _____

**1.5    Comply with Inspection Document 9 of the Cessna Recommended Inspection Program**
West Star Aviation, Inc. will accomplish Inspection Document 9 as described in the Citation 560XL Maintenance Manual

.    Aileron and Aileron Trim Tab Control System
.    Rudder and Rudder Trim Control System
.    Elevator and Elevator Trim Tab System

                    **Firm Price Labor:**            $      7,068.00

                    Accept _TMC_                     Decline _____

**1.6    Comply with Inspection Document 47 of the Cessna Recommended Inspection Program**
West Star Aviation, Inc. will accomplish Inspection Document 47 as described in the Citation 560XL Maintenance Manual.

.    Lead-Acid Battery

                    **Firm Price Labor:**            $        558.00

                    Accept _TMC_                     Decline _____

**1.7    Comply with Inspection Document 48 of the Cessna Recommended Inspection Program**
West Star Aviation, Inc. will accomplish Inspection Document 48 as described in the Citation 560XL Maintenance Manual.

.    Standby Nav/Com Control Unit

                    **Firm Price Labor:**            $         93.00

                    Accept _TMC_                     Decline _____

**1.8    Comply with Cabin and Cockpit Fire Extinguisher Visual Inspeciton**
West Star Aviation Inc. will perform the cabin and cockpit fire extinguisher visual inspection.

                    **Firm Price Labor:**            $        105.00

                    Accept _TMC_                     Decline _____

Exhibit A

*JBA Aviation, Inc.*
*Proposal 1500644GJT   Rev:4*



| | |
|---|---|
| **1.9** | **Comply with Fuel Leak Check and Document Results** |

West Star Aviation, Inc. will accomplish fuel leak check and document results.

|  | Firm Price Labor: | $ | 840.00 |
|---|---|---|---|
|  | Accept *Tuc* | Decline _____ | |

**1.10   Comply with Gear Swing**

West Star Aviation, Inc. will perform a gear swing.

|  | Firm Price Labor: | $ | 630.00 |
|---|---|---|---|
|  | Accept *Tuc* | Decline _____ | |

**1.11   Comply with Microbiological Fuel Contamination Check**

West Star Aviation Inc. will sump the wings and use a "Hum Bug" kit to test the fuel for micrbiological fuel contamination.

|  | Firm Price Labor: | $ | 315.00 |
|---|---|---|---|
|  | Accept *Tuc* | Decline _____ | |

Exhibit A

*JBA Aviation, Inc.*
*Proposal 1500644GJT    Rev:4*



**Engine 1**

**2.1   Comply with 5 Point Engine Runs-No. 1 Engine**
West Star Aviation, Inc. will accomplish the  5 point engine runs.

          **Firm Price Labor:**          $        630.00

          Accept _TMC_          Decline _____

**2.2   Comply with No. 1 Engine Igniter Inspection**
West Star Aviaiton, Inc. will accomplish No. 1 engine  Igniter Inspection per the Pratt & Whitney Maintenance Manual.

          **Firm Price Labor:**          $        315.00

          Accept _TMC_          Decline _____

**2.3   Comply with the No. 1 Engine  Borescope**
West Star Aviation, Inc. will accomplish the borescope of the No. 1 Engine.

Note:If the engine is on a program, authorization may be required prior to the borescope.

          **Firm Price Labor:**          $        630.00

          Accept _TMC_          Decline _____

Exhibit A

*JBA Aviation, Inc.*
*Proposal 1500644GJT    Rev:4*



---

**Engine 2**

3.1   **Comply with 5 Point Engine Runs-No. 2 Engine**
West Star Aviation, Inc. will accomplish the 5 point engine runs.

| | | | |
|---|---|---|---|
| **Firm Price Labor:** | $ | 630.00 |
| Accept *Tmc* | | Decline _____ |

3.2   **Comply with No. 2 Engine Igniter Inspection**
West Star Aviaiton, Inc. will accomplish No. 2 Engine Igniter Inspection per the Pratt & Whitney Maintenance Manual.

| | | | |
|---|---|---|---|
| **Firm Price Labor:** | $ | 315.00 |
| Accept *Tmc* | | Decline _____ |

3.3   **Comply with the No. 2 Engine  Borescope**
West Star Aviation, Inc. will accomplish the No. 2 engine borescope.

Note:If the engine is on a program, authorization may be required prior to the borescope.

| | | | |
|---|---|---|---|
| **Firm Price Labor:** | $ | 630.00 |
| Accept *Tmc* | | Decline _____ |

---

Exhibit A

*JBA Aviation, Inc.*
*Proposal 1500644GJT    Rev:4*



| APU | |
|---|---|

**4.1    Comply with Borescope the APU**
West Star Aviation, Inc. will accomplish the borescope of the APU and document results.

|  | | | |
|---|---|---|---|
| **Firm Price Labor:** | **$** | **525.00** | |
| Accept  *Tmc* | | Decline _____ | |

Exhibit A

*JBA Aviation, Inc.*
*Proposal 1500644GJT    Rev:4*



## TERMS AND CONDITIONS FOR WEST STAR AVIATION, INC.

1.  **LIMITED WARRANTY.** Workmanship for maintenance and modification is warranted against defect for the earlier of 6 months, or 200 flight hours from the date of return to service. Workmanship on modifications and installations incorporating new equipment and/or components is warranted against defects earlier of 6 months, or 200 flight hours from the date of return to service. Paint services are warranted against defects in material and workmanship under normal use for 2 years from the date of return to service. Interior services are warranted against defects in material and workmanship under normal use for 1 year. These warranties apply only if the aircraft/equipment is returned to West Star Aviation, Inc. facilities at Customer's expense for repair with a written description of the defect. West Star Aviation, Inc. does not warrant parts, materials, components, equipment or services supplied or performed by other companies, but will give Customer reasonable assistance in enforcing Customer's rights under any such supplier and subcontractor warranty and Customer shall reimburse West Star Aviation, Inc.'s reasonable costs and expenses incurred in rendering such assistance. West Star Aviation, Inc.'s warranties do not extend to (a) Customer furnished parts, materials, equipment or components, (b) installation, in West Star Aviation, Inc.'s determination, which has been repaired, altered, misused or subjected to negligence or an accident, which adversely affect its performance. Additional warranties may apply and are available upon request.

    **THIS WARRANTY IS EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, WHETHER WRITTEN, ORAL, EXPRESS, IMPLIED OR STATUTORY (INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OR MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE). IN NO EVENT SHALL WEST STAR AVIATION, INC. BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES, INCLUDING WITHOUT LIMITATION, LOST REVENUE OR PROFIT AND COST OF REPLACEMENT AIRCRAFT. NO AGREEMENT EXTENDING THIS WARRANTY SHALL BE BINDING UPON WEST STAR AVIATION, INC. UNLESS IN WRITING AND SIGNED BY ITS DULY AUTHORIZED OFFICER OR REPRESENTATIVE. THE ABOVE WARRANTY IS THE ONLY WARRANTY GIVEN UNLESS OTHER WARRANTIES ARE ATTACHED AND MADE A PART HEREOF.**

2.  **LIMITATION OF LIABILITY.** TO THE FULLEST EXTENT PERMITTED BY LAW, WEST STAR AVIATION, INC.'S LIABILITY ON ANY CLAIM OF ANY KIND, INCLUDING NEGLIGENCE FOR ANY LOSS (INCLUDING DEATH) OR DAMAGE ARISING OUT OF, CONNECTED WITH, OR RESULTING FROM THIS AGREEMENT, OR FROM THE PERFORMANCE OR BREACH THEREOF, OR FROM THE MANUFACTURER, SALE, REDELIVERY, RESALE, REPAIR OR USE OF ANY ARTICLE OR WORK COVERED BY OR FURNISHED UNDER THIS AGREEMENT SHALL IN NO CASE EXCEED THE PRICE ALLOCABLE TO THE ARTICLE OR WORK WHICH GIVES RISE TO THE CLAIM. ANY SUCH LIABILITY SHALL BE CONDITIONED ON CUSTOMER PROVIDING PROMPT WRITTEN NOTICE TO WEST STAR AVIATION, INC. OF ANY CLAIM AND, IN ANY EVENT, WITHIN ONE YEAR FROM THE DATE OF OCCURRENCE OF THE CLAIM UNLESS THE PARTIES HAVE AGREED IN WRITING TO A DIFFERENT CLAIM PERIOD. IN NO EVENT SHALL WEST STAR AVIATION, INC. BE LIABLE FOR SPECIAL, INCIDENTAL, INDIRECT, PUNITIVE, OR CONSEQUENTIAL DAMAGES INCLUDING, WITHOUT LIMITATION, LOST REVENUE OR PROFIT AND COST OF REPLACEMENT AIRCRAFT OR FOR ANY DAMAGES ARISING FROM OR RELATED TO ACTS OF WAR OR TERRORISM.

3.  **TAXES AND DELIVERY.** Prices are based on delivery to West Star Aviation, Inc.'s repair facility, Delivered Duty Paid ("Delivery") and redelivery to Customer at West Star Aviation, Inc's facility ("Redelivery"). All Federal, State or local taxes applicable to the sale, possession, use, or transportation of the articles sold or the Work performed and all duties, imposts, tariffs or other similar levies, shall be added to the prices and paid by Customer, unless Customer furnishes an appropriate certificate of exemption. Customer shall indemnify and hold West Star Aviation, Inc. harmless from the payment or imposition of any tax or levy imposed on any articles sold, or for any Work performed, plus penalties, interest or reasonable attorney's fees connected with the imposition of any such tax or levy.

4.  **TITLE/LIEN.** Title to the Work passes to Customer at Redelivery. If Redelivery is more than 60 calendar days from the date of Delivery to West Star Aviation, Inc. reserves the right to transfer title to the Work to Customer when items are incorporated into Customer's aircraft and to invoice Customer for such items at that time. Customer grants to West Star Aviation, Inc. a continuing, first priority security interest in and lien upon the Work, the Aircraft and any proceeds thereof, including but not limited to insurance proceeds or sale or disposition of the Aircraft or any portion thereof and the proceeds of such proceeds ("collectively, the Collateral") to secure prompt repayment of any and all amounts owed by Customer to West Star Aviation, Inc. West Star Aviation, Inc.'s security interest in and lien upon the Collateral shall attach to all of the Collateral upon the execution and delivery of this Agreement, without further act being required on the part of either Customer or West Star Aviation, Inc.

5.  **PAYMENT.** Full payment is required prior to Redelivery. A non-refundable deposit of interior, modifications, paint and/or avionics installation(s) is required and will be retained as liquidated damages in the event the project is canceled by Customer. Progress payments are required for projects in excess of $100,000.00. Payments are due within 30 days of invoice date for Customers with an established credit line or a monthly finance charge of 1.75% will be assessed. If a final invoice cannot be provided at Redelivery, Customer shall deliver payment based upon an estimated invoice and supplementary invoices reflecting the actual charges and balances will be submitted to Customer as soon as practicable and will be reconciled with the amounts previously invoiced to Customer and/or paid. Payments must be in United States Dollars and in the form of certified funds, wire transfer or cash.

6.  **DELAYS.** West Star Aviation, Inc. shall not be liable for delays in delivery, performance, of failure to perform, manufacture or Redeliver due to causes beyond its reasonable control, or acts of God, acts of Customer, acts of government or military authority, increase in the scope of work requested by Customer, condition of the aircraft, delays in transportation or shortages, or inability due to causes beyond its reasonable control to obtain necessary labor, materials, utilities, components or manufacturing facilities. In the event of any such delay, the date of performance/ Redelivery shall be extended for a period of time as may be reasonably necessary to compensate for any such delay.

7.  **GOVERNMENTAL AUTHORIZATIONS.** Customer must timely obtain all required governmental authorizations, including import or export licenses and exchange permit. Customer shall remain importer/exporter of record, regardless of whether West Star Aviation, Inc. provides Customer with assistance in this area. West Star Aviation, Inc. shall not be liable if any authorization is delayed, denied, revoked, restricted, or not renewed and Customer shall not be relieved of its obligation to pay for the Work or any services rendered by West Star Aviation, Inc. All articles, parts or equipment delivered shall at all times be subject to the U.S. Export Administration Regulations and/or International Traffic in Arms Regulation and/or Customs Regulations and laws of the U.S.A. and any amendments. Customer agrees not to dispose of U.S. origin items provided by West Star Aviation, Inc. other than in and to the country of ultimate destination specified in Customer's purchase order and/or approved government license(s) or authorizations(s), except as these laws and regulations may permit.

8.  **INDEMNIFICATION.** West Star Aviation, Inc. shall indemnify and hold Customer harmless for any loss or damage to the aircraft occurring while it is not in flight, providing such damage to the aircraft is caused by the negligence of West Star Aviation, Inc., its employee, independent contractors or agents. In no event shall West Star Aviation, Inc.'s indemnity obligations exceed the amount provided in Paragraph 2 hereof. After the Aircraft leaves the custody of West Star Aviation, Inc., Customer shall indemnify and hold West Star Aviation, Inc. harmless for any claim (including reasonable attorney's fees and litigation or dispute resolution fees) against West Star Aviation, Inc. in connection with the services provided by West Star Aviation, Inc. pursuant to this Agreement providing the claim results from negligence of Customer, its employees, independent contractors, agent or third parties in operational control of the Aircraft, except to the extent such claim results from the contributory negligence or willful misconduct of West Star Aviation, Inc., its employees, independent contractors or agents. Neither party shall have any obligation to indemnify the other for losses or damages that arise from or are related to acts of war or terrorism.

Exhibit A

*JBA Aviation, Inc.*
*Proposal 1500644GJT    Rev:4*



9.  **ACCESS TO FACILITIES AND CHANGES.** Customer shall have access during normal business hours to unrestricted areas at West Star Aviation, Inc.'s facilities and the aircraft while the Work is being accomplished and shall observe West Star Aviation, Inc.'s regulations. Customer may request changes to the Work if documented on a West Star Aviation, Inc. Customer Service Request and Agreement Amendment, or contract/proposal addendum signed by Customer. Customer acknowledges that changes may affect price and Redelivery and is responsible for any change in price, including overtime required for such change.

10. **DEFAULT.** Should events occur which would give rise to a claim by Customer that West Star Aviation, Inc. has breached this Agreement or is otherwise in default, Customer shall first give West Star Aviation, Inc. a thirty (30) calendar day written notice of such claim. Before Customer can submit such claim to any dispute resolution process, West Star Aviation, Inc. shall have the thirty (30) calendar day period to cure any claim and avoid any liability to Customer. Customer's breach or failure to pay any sum due under this Agreement or any other agreement or contract with West Star Aviation, Inc. regardless of when the agreement or contract was entered into, will at West Star Aviation, Inc.'s sole option if the breach or nonpayment is not cured within ten (10) calendar days after written notice of the breach, constitute a default of this Agreement and all other agreements and contracts between Customer and West Star Aviation, Inc. In such an event, West Star Aviation, Inc. may at its option withhold performance under this Agreement and any or all of the other agreements and contracts until a reasonable time after all defaults have been cured, and/or do anything else that the law permits.

11. **DISPUTE RESOLUTION.** If a disputed, claim or controversy arising out of or relating to the Agreement occurs (the "Dispute"), either party shall give written notice to the other party requesting that senior management attempt to resolve the Dispute. Within fifteen (15) calendar days after receipt of such notice, the receiving party shall submit a written response. Both the notice and the response shall include a statement of the applicable party's position and a summary of reasons supporting that position. The parties shall cause senior management to meet within thirty (30) calendar days after receipt of the notice, at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to use commercially reasonable efforts to resolve the Dispute in good faith.

12. **ATTORNEY FEES.** The prevailing party in any litigation to enforce this Agreement or any obligation concerning its subject matter shall be entitled to its reasonable costs and attorneys' fees in addition to any relief obtained.

13. **APPLICABLE LAW.** This Agreement shall be interpreted in accordance with the law of the State where the work is accomplished, without regard to conflicts of law principles. The parties consent and hereby submit to the exclusive jurisdiction of the state courts located in the county and state where the work is accomplished for a determination of any and all issues between them relating to this Agreement or its subject matter. Customer Hereby Waives 1) The right to a jury trial in any and all proceedings, 2) Any and all objections to venue and inconvenient forum in the state courts referred to in this section, and 3) Any and all rights to remove any action to the United States District Courts.

14. **AUTHORITY.** ANYONE SIGNING FOR CUSTOMER REPRESENTS THAT SHE OR HE IS EMPLOYED BY CUSTOMER IN THE CAPACITY INDICATED AND IS UNEQUIVOCALLY AUTHORIZED TO BIND CUSTOMER TO THIS AGREEMENT.

15. **ADDITIONAL CHARGES.** The following additional charges are not included in the quoted prices and shall be paid by upon demand if applicable:

    a.  Repair of any customer-furnished parts, material or equipment found not otherwise suitable for its intended use.
    b.  Rework or additions to customer furnished engineering.
    c.  Fuel, oil, insurance and flight crews required for flight testing, certification and/or ground runs on an aircraft.
    d.  If overtime is required in order to complete the work on the schedule requested by Customer, West Star Aviation, Inc. will advise Customer of the necessity and estimated cost and Customer will have the option to pay overtime rates or adjust the Redelivery date.
    e.  Necessary replacement parts.
    f.  Removal and reinstallation or modification of interior components.
    g.  Redelivery Flights by West Star Aviation, Inc. and related freight, transportation, insurance, taxes, imposts, or other similar charges.
    h.  Any replacement parts required in an exchange core overhaul which are not required as part of a normal overhaul.
    i.  Shipping and handling charges in the amount of 2.13% of the total invoice amount will be applied.
    j.  Cores that are returned for credit that are rejected, charged additional fees for excessive damage, or for overhaul charges.
    k.  A consumable charge of 3% will apply to all billed labor charges not to exceed $3,000.00.
    l.  A minimum 10% handling fee will be assessed to all customer-supplied parts.
    m.  Additional certification costs to meet non-FAA compliance requirements will be billed on a time and material basis.

16. **AVIONICS.** Any proposal for avionics work is subject to West Star Aviation, Inc.'s review of the aircraft's wiring diagrams, availability of adequate space and power on the aircraft, the aircraft's compatibility with the system to be installed and an explanation of Customer's expectations and mission requirements. West Star Aviation, Inc. requires that Customer send avionics drawing, a photograph of the instrument panels and pedestal and an equipment list.

17. **SUBSTITUTIONS.** West Star Aviation, Inc. reserves the right to incorporate changes deemed necessary by West Star Aviation, Inc. to avoid delays or improve product control, performance, reliability, utility, manufacture or appearance of the Work.

18. **PMA PARTS, PRICING AND SHOP RATES. Pricing quoted herein is valid for a period of thirty (30) days from the date of this proposal.** Parts pricing is subject to change by the OEM. FAA PMA approved parts may be used. Any parts or assemblies permanently removed from the aircraft as part of maintenance or modification events will become the property of West Star Aviation unless arrangements are made in advance to the contrary. Work is performed on a West Star materials basis, unless a flat-rated basis for labor is specified. Pricing may or may not include an agency or finders fee. Quoted prices for inspections include flat-rated labor in accordance with the requirements in the manufacturer's inspection manual. Flat-rated labor is billed at the quoted rate regardless of the actual amount of labor required. Time and Materials items are billed based upon the actual materials, parts, labor and outside services used. West Star Aviation will apply a minimum of 15% markup on all parts and outside vendor services.

19. **MISCELLANEOUS.** This Agreement is the entire agreement and exclusive statement of the Work to be done and the applicable terms and conditions, and supersedes any prior agreements and contemporaneous oral agreements, of the parties concerning its subject matter. No amendment of, or waiver of a right under, this Agreement will be binding unless it is in writing and signed by Customer and West Star Aviation, Inc. If a provision of this Agreement is unenforceable, this Agreement will be construed as if the unenforceable provision were omitted. Failure by a party to assert any right under this Agreement shall not be a waiver of such right and no waiver shall be implied from the acceptance of any payment or service. No written waiver of any right shall extend to any subsequent similar or dissimilar breach. In the event of a conflict between this Agreement and any other agreement between West Star Aviation, Inc. and Customer, the terms of this Agreement shall prevail. The titles and subtitles given to Sections of the Agreement are for convenience only and shall not limit or restrict the context of the Section to which they relate. The provisions of this Agreement are for the benefit of the parties and not for the benefit of any other person.

*JBA Aviation, Inc.*
*Proposal 1500644GJT   Rev:4*



Aircraft Downtime
The estimated downtime for the work quoted above is (10-12)  business days for the inspection portion only, depending on work scope elected and other work accomplished in conjunction with the inspection, installation and/or modification.

De-Fuel
Aircraft requiring de-fueling will be assessed a charge of $0.22 per gallon for fuel re-certification.

Payment Terms
100% of the technical evaluation and technical evaluation option pricing is due at contract signing.

General payment terms for any maintenance visit that the quote estimate exceeds $100,000.00 will require one-third (1/3rd) of the approved quoted amount prior to aircraft input and one-third (1/3rd) to be paid at project mid-point.

Any modification visit that includes avionics, interior, and/or paint will require twenty-five percent (25%) at contract signing and twenty-five percent (25%) at aircraft input.

West Star Aviation, Inc. requires progress payments for any visit where labor, materials, and/or outside services are estimated to exceed $100,000.00.  Additional progress payments will be required if at any time the work in progress exceeds $100,000.00. All visits will require the total balance be paid in full prior to aircraft departure, unless credit terms have been established.

Discrepancies and Repairs
Pricing stated herein does not include any discrepancies and repairs that may be found.  This will be accomplished on a time and material basis at the labor rates stated below.

2015 Labor Rates
Citation Maintenance, Interior, and Paint Discrepancy and Repair Rates;
Standard Rate - $105.00 per hour, Overtime Rate - $157.50 per hour
Citation Avionics Discrepancy and Repair Rates;
Standard Rate - $109.00 per hour, Overtime Rate - $163.50 per hour


West Star Aviation, Inc.                              Agreed to Accepted Items and
                                                     Terms & Conditions:

_____                              _____
Jerry Sheetz                                         JBA Aviation, Inc.
Sales Representative

Approved:_____                                    By: _____
                                                     Title: _____
                                                     Date: ____4/24/15____

Exhibit A

*JBA Aviation, Inc.*
*Proposal 1500644GJT    Rev:4*



## Proposal Summary:

**Airframe Maintenance Inspections**

| | | |
|---|---|---|
| Total Firm Price Labor: | $ 27,969.00 | |
| Estimated Parts/Services: | $ - | |
| **Airframe Maintenance Inspections Quoted Price:** | **$ 27,969.00** | |

**Engine 1**

| | | |
|---|---|---|
| Total Firm Price Labor: | $ 1,575.00 | |
| Estimated Parts/Services: | $ - | |
| **Engine 1 Quoted Price:** | **$ 1,575.00** | |

**Engine 2**

| | | |
|---|---|---|
| Total Firm Price Labor: | $ 1,575.00 | |
| Estimated Parts/Services: | $ - | |
| **Engine 2 Quoted Price:** | **$ 1,575.00** | |

**APU**

| | | |
|---|---|---|
| Total Firm Price Labor: | $ 525.00 | |
| Estimated Parts/Services: | $ - | |
| **APU Quoted Price:** | **$ 525.00** | |

**Note: This pricing summary does not include any discrepancies and repairs.  For better understanding of what is included in the proposal summary customer shall reference the full proposal description.**

Exhibit A

**Exhibit B**
**Aircraft Specifications**
**Cessna 560XL, S/N 560-5067, Registration No. N309BT**

**AIRFRAME:**   5,369.1 Hours Since New      **LANDINGS**:   3,948 Since New

**ENGINES:**   Pratt & Whitney PW545A – Enrolled on Power Advantage **Plus** Program
    (1)        S/N PCE-DB0195           (2)        S/N PCE-DB-0136
               5,245.3 Hours Since New                 5,196.3 Hours Since New
               3,868 Cycles Since New                  3,834 Cycles Since New

**APU**:        Honeywell RE100XL
               S/N P-745
               1,486.3 Total Hours as of March 20, 2015

**AVIONICS**:   Honeywell DU-870 3-Tube/Primus II
ADF:           Honeywell SRZ-50
COMMS:         Dual Honeywell Primus II w/8.33 Spacing
CVR:           Fairchild A200S
DME:           Dual Honeywell DM-850
EFIS:          Honeywell DU-870 3-Tube
FDR:           Honeywell SSFDR
FLT. DIR.:     Honeywell DU-870 3-Tube
FMS:           Universal UNS-1Csp w/GPS (Provisions for Second)
NAVS:          Dual Honeywell RNZ-850 w/FM Immunity
RAD. ALT.:     Collins ALT-55B
RADAR:         Honeywell Primus 880
TAWS:          Honeywell EGPWS
TCAS:          Honeywell TPU-67A TCAS II w/Change 7
XPDR:          Dual Honeywell XS-852 Mode S

**ADDITIONAL FEATURES & EQUIPMENT:**
Honeywell EGPWS
Multifunction Display
Dual Honeywell AZ-850 Air Data Computers
Kannad 406P ELT 406 MHz (Portable)
Remote Cabin Temperature Control
Rosen Sunvisors
Tail Flood Lights
Locator Beacon
Pulselights
64 Cu Ft Oxygen System
Quick-Donning Oxygen Masks
Lead Acid Battery (RG-380E)
Dual 110V Outlets
Thrust Reversers

Exhibit A

**INTERIOR**:   **Completed February 2010**
Eight passenger fireblocked executive interior features forward two-place side-facing couch, mid-cabin four-place club seats, and dual aft forward-facing seats, completed in light leather.  Entertainment system includes four individual monitors, single bulkhead monitor and dual DVD players.  Additional cabin amenities include forward left deluxe refreshment center, forward right closet dual executive tables, dual Slimline tables, indirect and dropped aisle lighting, underseat storage drawers, aft left side closet and aft externally serviced lavatory.

**EXTERIOR**:   **Completed February 2010**
Overall Matterhorn White with Titanium Silver, Steel Blue and Ocean Blue accents.

**MAINTENANCE STATUS:**
Maintained FAR Part 135
Enrolled on Power Advantage Plus
AvTrak GlobalNet Electronic Maintenance Tracking
RVSM Approved
Two New Windshields Installed:  LH October, 2008 and RH May 2009

Specifications are subject to verification. Aircraft subject to prior sale or removal from market.
The specifications are for introductory purposes only, the information is in no way a warranty from Express Jets or the owner of the aircraft on the validity of the information.  Buyer should rely on their inspection and verification of the above listed information

Exhibit A

Exhibit C
## NOTIFICATION OF RESULTS OF AIRCRAFT PREPURCHASE INSPECTION

Pursuant to the provisions of the Aircraft Sale & Purchase Agreement dated April 27, 2015 (the "Agreement") between Thorndike Ventures, LLC ("Purchaser") and BT Aviation, LLC ("Seller"), you are hereby notified that Purchaser has completed its Inspection of that certain Cessna model 560XL aircraft, serial number 560-5067, registration mark N309BT, and hereby (initial whichever box is applicable):

☐      **Accepts the Aircraft.** The Escrow Deposit is non-refundable is non-refundable unless Seller fails to perform its obligations pursuant to the Agreement.

☐      **Accepts the Aircraft subject to the Seller's obligation to correct the Discrepancies listed on Annex 1 attached to this notification, and further acknowledges that the Aircraft Documents are acceptable to Purchaser.** The Escrow Deposit is non-refundable unless Seller fails to perform its obligations pursuant to the Agreement.

☐      **Rejects the Aircraft Pursuant to Section 1.3(f).** Escrow Agent will be notified and directed to refund the Escrow Deposit upon Purchaser's payment of the Relocation Expenses pursuant to the Agreement.

DATED:_____      Thorndike Ventures, LLC
                            ("Purchaser")


                            By:_____

                            Name:_____

                            Title:_____

Seller hereby acknowledges and agrees to the conditions set forth above.

DATED:_____      BT Aviation, LLC
                            ("Seller")


                            By:_____

                            Name: Richard Toussaint

                            Title: President

Exhibit D
## DELIVERY RECEIPT

THIS DELIVERY RECEIPT is delivered as of the date set forth below by BT Aviation, LLC ("Seller") to Thorndike Ventures, LLC  ("Purchaser") pursuant to the Aircraft Sale & Purchase Agreement between Seller and Purchaser dated as of April 27, 2015 (the "Agreement")

Purchaser hereby indicates and confirms to Seller that Purchaser has, at _____, on _____, 2015 at _____AM/PM, in accordance with the provisions of the Agreement accepted that certain Cessna model 560XL aircraft, serial number 560-5067, registration mark N309BT, together with all engines, avionics, items of equipment, furnishings, instruments, components and accessories installed therein or thereon, including the Pratt & Whitney model PW545A  engines, serial numbers PCE-DB0195 and PCE-DB0136 (collectively the "Aircraft").

PURCHASER ACKNOWLEDGES THAT IT HAS INSPECTED THE AIRCRAFT AND EQUIPMENT AND THE RECORDS RELATING THERETO AND THAT THE AIRCRAFT, EQUIPMENT AND RECORDS ARE FULLY SATISFACTORY TO IT AND IN ACCORDANCE WITH THE AGREEMENT.

TOTAL TIME AIRFRAME AT DELIVERY:_____ hours / _____ cycles

TOTAL TIME ENGINES AT DELIVERY:

Engine PCE-DB0195: _____ hours / _____ cycles

Engine PCE-DB0136: _____ hours /_____ cycles

TOTAL TIME APU AT DELIVERY:_____ hours

IN WITNESS WHEREOF Purchaser has caused this instrument to be executed and delivered by its duly authorized officer at the date and the time of delivery set forth above.

Thorndike Ventures, LLC


By:_____

Name:_____

Title:_____

Exhibit E
## WARRANTY BILL OF SALE

KNOWN ALL MEN BY THESE PRESENTS, that BT Aviation, LLC, a Texas limited liability company ("Seller"), for good and valuable consideration paid to it by Thorndike Ventures, LLC, a Delaware limited liability company ("Purchaser"), the receipt and sufficiency of which is hereby acknowledged by Seller, has bargained, sold, transferred, assigned, set over and conveyed, and by these presents does hereby grant, bargain, sell, transfer, assign, set over and convey unto the Purchaser, its successors and assigns forever, all of its rights, title and interest in and to that certain Cessna model 560XL aircraft, serial number 560-5067, registration mark N309BT (the "Airframe") with the two (2) attached Pratt & Whitney engines, bearing the manufacturer's model PW545A  with serial numbers PCE-DB0195 and PCE-DB0136 engines along with a Honeywell RE100XL, Serial number P-745 APU, all installed thereon (the "Engines"), together with all equipment, appliances, parts, instruments, appurtenances, accessories, furnishings, and other property installed in or attached to the Airframe or Engines (the "Equipment"), Aircraft Documents (as defined in the Agreement), together with all loose equipment delivered to Purchaser (The Airframe, Engines, Equipment, and Aircraft Documents will be collectively hereinafter referred to as the "Aircraft").

TO HAVE AND TO HOLD for Purchaser, its successors' and assigns' own use forever.

Seller hereby warrants that (a) Seller is the owner and holder of and has full legal and beneficial title to the Aircraft; (b) Seller has good right and full power to sell the aircraft to Purchaser; (c) Seller's title thereto is on the date hereof good, indefeasible and marketable; and (d) Seller hereby transfers to Purchaser all its rights, title and interest in and to the Aircraft, free and clear of all notations, clouds, claims, liens, mortgages, encumbrances, or rights of others. Seller, its successors and assigns, covenant and agree to warrant and defend the title to the Aircraft, unto Purchaser, its successors and assigns, against all persons whomsoever.

Seller further covenants and agrees with Purchaser that he will, from time to time at the request of Purchaser, execute and deliver or cause to be executed and delivered all such further bills of sale, assignments, instruments of transfer and agreements, including without limitation an FAA Bill of Sale on AC form 8050-2, as may reasonably be required by Purchaser in order to vest in Purchaser title to the Aircraft and the Logs and Records.

This Warranty Bill of Sale and the rights and obligations of Seller and Purchaser hereunder (including without limitation all matters of construction, validity and performance) shall be governed by and construed in accordance with the laws of Texas, and is being delivered pursuant to the terms and conditions of the Aircraft Sale & Purchase Agreement dated April 27, 2015 (the "Agreement") between Seller and Purchaser.

Each provision of this Bill of Sale shall bind each of the Seller, and its successors and assigns, and shall inure to the benefit of and be enforceable by Purchaser, and its successors and assigns.

IN WITNESS WHEREOF, SELLER has caused this Warranty Bill of Sale to be executed this ____ day of _____, 2015.

Seller: BT Aviation, LLC


By:_____

Name: Richard Toussaint, President

Exhibit A

## AMENDMENT & SUPPLEMENT AGREEMENT

## TO

## AIRCRAFT SALE & PURCHASE AGREEMENT

**THIS AMENDMENT & SUPPLEMENT AGREEMENT** dated July 7 , 2015 (the "Supplement") by and between BT Aviation, LLC, a Texas limited liability company whose address is 3712 Euclid Ave., Dallas, Texas 75205 (the "Seller"); Richard Toussaint, a resident of Dallas County, Texas (the "Seller's Principal"); Thorndike Ventures, LLC, a Delaware limited liability company, whose notice address is 10731 South 94th East Court, Tulsa, Oklahoma 74133 (the "Purchaser") and Todd M. Coady, a resident of Tulsa County, Oklahoma (the "Purchaser's Principal").

**WHEREAS**, the parties entered into an Aircraft Sale & Purchase Agreement (the "Purchase Agreement"), made and dated April 27, 2015 for the purchase and sale of a 2000 Cessna 560XL as described in more detail in the Purchase Agreement (the "Aircraft");

**WHEREAS**, the Seller's Principal was indicted on May 19, 2015 by a Federal grand jury on seventeen counts of healthcare fraud (the "Indictment") and the Indictment contained a forfeiture notice impacting the Seller's title to the Aircraft, in which the Purchaser claims is in breach of the representations and warranties of the Seller and Seller's Principal in the Purchase Agreement;

**WHEREAS**, the Purchaser and Purchaser's Principal had no notice or knowledge of the Indictment or investigations relating to same until the news media reported same;

**WHEREAS**, The Purchaser and Purchaser's Principal gave notice of termination of the Purchase Agreement to the Seller's counsel on May 28, 2015 due to alleged breaches of the Purchase Agreement and impairments to clear title to the Aircraft arising from the Indictment and similar matters;

**WHEREAS**, Seller and Seller's Principal hereby provide additional assurances to the Purchaser and Purchaser's Principal to induce them to consummate the purchase of the Aircraft Pursuant to the Purchase Agreement and this Supplement.

**THEREFORE**, in consideration of the mutual covenants set forth herein, the parties agree as follows:

1. The Purchase Agreement shall continue in full force and effect except as set forth in this Supplement. In the event of any conflict between the Purchase Agreement and this Supplement, this Supplement shall control.

2. The Seller's Principal shall obtain an executed and entered Order and supporting Stipulation and Motion from the United States District Court in the forms attached hereto or as otherwise approved by Purchaser in writing in his sole and unfettered discretion (the "Court Orders").

3. The Seller's Principal shall cause the Dallas County District Attorney acting for the State of Texas to consent to or otherwise provide assurances for the benefit of the Purchaser and Purchaser's Principal with respect to potential claims against the Aircraft arising from the

1

practice of medicine or the management of medical facilities by the Seller's Principal, all in a form acceptable to Purchaser in his sole and unfettered discretion.

4. As set forth in the Court Orders, the Seller shall cause all net proceeds from the sale of the Aircraft to be placed in escrow, and such escrow balances shall be held in escrow for the benefit of federal and state claims arising from the allegations in the indictment dated May 19, 2015, until the later of (i) six 6) months after the conclusion of the federal criminal case or (ii) the conclusion of any claims by any federal, state or governmental entity alleging a right to seizure or forfeiture of the Aircraft or the proceeds from the sale of the Aircraft commenced prior to the period in (i) above..

5. The Seller's Principal and his wife Adelle Toussaint each independently swears and affirms that he or she:
   a. Shall each execute and personally guarantee the obligations of the Seller in the Warranty Bill of Sale attached as Exhibit E to the Purchase Agreement.
   b. Has no knowledge of any criminal acts or investigations arising from or attributable to his conduct that could create a right of seizure or forfeiture with respect to the Aircraft, other than the current investigation by the United States Department of Justice.
   c. Affirm, joins and restates the representations and promises contained in Sections 2.4 and 3.8(a) of the Purchase Agreement.
   d. Did not provide direct or indirect notice of the Indictment or related investigations to the Purchaser or Purchaser's Principal but otherwise negotiated the sale of the Aircraft in good faith;
   e. Has no business or family connection or relationship with the Purchaser or Purchaser's Principal;
   f. Has no agreement or arrangement with the Purchaser or Purchaser's Principal to rebate, share or otherwise provide any direct or indirect benefit to the them except as set forth in the Purchase Agreement and this Supplement;
   g. Represents that the personal financial statement dated December 31, 2014 is true and correct except as to the claims in the Indictment;
   h. Believes that the sales price of the Aircraft under the Purchase Agreement represents its fair value of the Aircraft without regard to any impact of the Indictment on the Seller's Principal's desire to sell; and
   i. Shall pay at closing up to $20,000 of Purchaser's legal fees incurred as a result of the Indictment.

6. The Purchaser and Purchaser's Principal shall not disclose the personal financial statement of the Seller's personal financial statement except:
   a. As required to defend title to the Aircraft or enforce this Supplement or the Purchase Agreement; or
   b. As required by any court or governmental entity.

7. This Supplement may be executed in multiple counterparts and may be exchanged via email or facsimile.

IN WITNESS WHEREOF, this Agreement has been executed by Purchaser, Purchaser's Principal, Seller, Seller's Principal and his wife as of the date first written above.

SELLER:

BT Aviation, LLC
a Texas limited liability company

By: _____

Richard Toussaint, President

SELLER'S PRINCIPAL:

_____
Richard Toussaint

SELLER'S PRINCIPAL'S WIFE:

_____
Adelle Toussaint

ESCROW AGENT & ATTORNEY FOR
SELLER'S PRINCIPAL

_____
Richard Roper

PURCHASER:

Thorndike Ventures, LLC

By: _____
Todd M. Coady, Manager

PURCHASER'S PRINCIPAL:

_____
Todd M. Coady

3

Exhibit A

IN WITNESS WHEREOF, this Agreement has been executed by Purchaser, Purchaser's Principal, Seller, Seller's Principal and his wife as of the date first written above.

SELLER:

BT Aviation, LLC
a Texas limited liability company

By:   _____

     Richard Toussaint, President


SELLER'S PRINCIPAL:


_____

Richard Toussaint

SELLER'S PRINCIPAL'S WIFE:


_____

Adelle Toussaint

ESCROW AGENT & ATTORNEY FOR SELLER'S PRINCIPAL


_____

Richard Roper

PURCHASER:

Thorndike Ventures, LLC

By:_____

     Todd M. Coady, Manager


PURCHASER'S PRINCIPAL:

_____

Todd M. Coady

3